FILED

2020 Aug-25  PM 04:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| COMMUNICATIONS | ) | |
| UNLIMITED CONTRACTING | ) | |
| SERVICES, INC., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-CV-00613-CLM |
| | ) | |
| LIBERTY MUTUAL | ) | |
| INSURANCE COMPANY, | ) | |
|     Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Communications Unlimited Contracting Services, Inc. ("CUI") installs cable equipment. CUI filed a claim with its insurer, Defendant Liberty Mutual Insurance Company ("Liberty Mutual"), for equipment that CUI claims was stolen by a CUI employee two years earlier. Liberty Mutual denied the claim for multiple reasons, including CUI's two-year delay in filing the claim.

CUI sues Liberty Mutual for breaching the terms of CUI's policy and acting in bad faith. Doc. 1. Liberty Mutual has moved for summary judgment on both claims. Doc. 34. As detailed within, undisputed facts establish that Liberty Mutual properly denied CUI's claim because of undue delay. So Liberty Mutual is entitled to summary judgment.

1

## STATEMENT OF FACTS

### A. Installing and Tracking Equipment

CUI is as a cable installation subcontractor. Comcast, a cable television provider, is CUI's biggest client. When Comcast needs equipment like cable boxes and modems ("equipment") installed in a customer's home, a CUI employee picks up the equipment from Comcast's warehouse and takes it to the CUI warehouse, where it remains until CUI installs the equipment at the customer's home.

Comcast inventories its equipment. When CUI takes equipment from Comcast's warehouse, Comcast adds the equipment to the CUI inventory. When CUI installs equipment at a customer's home, Comcast removes the equipment from CUI's inventory. If equipment goes missing—*i.e.*, if CUI takes it from the Comcast warehouse but does not install it in a customer's home—Comcast issues a "chargeback," which reduces the amount of money Comcast owes CUI by the value of the missing equipment.

### B. The Missing/Stolen Equipment

This case involves equipment that CUI claims was stolen from the Beltline Region of the Washington DC Area. On March 24, 2015, Comcast's Regional Senior Security Investigator emailed Jack Spears, CUI's Senior Director for Technical Operations for the Beltway Region. The investigator attached two spreadsheets that

showed "questionable activity" of two CUI operators. Doc. 38-2 at 1. One of the employees was Michael Melcher, CUI's Warehouse Manager for the warehouse that stored the equipment at issue. The "questionable activity" was Melcher entering equipment marked as "missing" as having been later installed at a customer's home, even though the equipment wasn't installed.

Sometime the next month (April 2015), Comcast told CUI that it was issuing a chargeback for equipment that had been missing since December 2014. CUI's Executive Vice President, Joseph Miller, instructed Spears to investigate the missing equipment. As part of his investigation, Spears talked to Melcher multiple times, and Melcher was never able to explain why he was entering equipment as being installed when it had not been installed. Doc. 38-1 at 19.

CUI fired Melcher on September 25, 2015. Melcher's "separation interview" paperwork states that his termination was "involuntary" and was based on a "violation of company policy" and "reorganization." Doc. 38-6. Spears testified that the "violation of company policy" was Melcher's inability to explain why he entered missing equipment as being installed at customer's homes when it had not been installed, thus rendering Melcher incapable of reconciling the missing equipment. Doc. 38-1 at 32.

CUI contested the chargeback for two years (April 2015 to April 2017). CUI maintained that there were many possible explanations for the missing equipment, including shortcomings in the way Comcast inventoried equipment. *See, e.g.*, Docs. 38-3, 38-4, 38-5 (communications from CUI to Comcast). CUI did not list employee theft as a possible explanation during this back-and-forth. *Id.* Nor, according to Spears and Miller, did CUI internally discuss or investigate the possibility that Melcher stole the equipment. *See* Docs. 36-1 at 7 (Miller); 38-1 at 30 (Spears).

Miller told Comcast that CUI believed the missing equipment was a "reporting error." Doc. 36-1 at 8. Comcast agreed to investigate. Comcast concluded its investigation in April 2017 with Comcast telling CUI that "this is not a Comcast error, this is not a reporting error, this has nothing to do with a Comcast system[.]" *Id.* at 8. Comcast told CUI that the missing equipment was a "CUI problem . . . and there's only two explanations for it. Either it's stolen or it's lost." *Id.*

CUI accepted Comcast's April 2017 determination that the missing equipment was either stolen or lost. CUI then determined, by process of elimination, that Melcher must have stolen the equipment because the equipment was not at CUI's warehouse. CUI did not have video evidence or a confession to support its finding of theft. *Id.*

Once CUI decided in April 2017 that Melcher had stolen the equipment, CUI decided to submit an insurance claim. But not to Liberty Mutual, at least not at first.

## C. The Aspen Policy claim

CUI had two policies that are relevant here: one with Liberty Mutual, and the other with Aspen American Insurance Company ("Aspen"). Liberty Mutual issued CUI a Commercial Crime Policy that was effective between November 18, 2014 and November 18, 2016. The Liberty Mutual Policy provided up to $250,000 of coverage for losses of CUI's clients' property for "theft" by a CUI employee. (The total amount of the chargeback was $572,303.)

Aspen issued CUI a similar policy, with similar "Crime Coverage," that was effective between November 18, 2016 and November 18, 2017. In other words, the Aspen policy began on the day that the Liberty Mutual policy ended.

CUI submitted a claim to Aspen on April 27, 2017, doc. 39-3, and submitted its Proof of Loss form on August 9, 2017. Doc. 36-1. Aspen wrote a letter back to CUI noting that, in its Proof of Loss, CUI claimed that it discovered the loss "on or before November 2016" and that "no coverage would be afforded to the extent that the loss was discovered before November 16, 2016." Doc. 37-1 at 71. CUI ultimately withdrew its claim with Aspen. Doc. 39-11 at 6.

**D. The Liberty Mutual Policy claim**

CUI submitted a claim to Liberty Mutual on September 6, 2017—*i.e.,* one week after Aspen told CUI that Aspen would not cover the claim if CUI discovered the loss before November 16, 2016. CUI submitted its Proof of Loss form on October 13, 2017. Doc. 35-1 at 167. In it, CUI's general counsel, Ron Kent, stated that CUI "discovered" the covered loss in "April 2015." *Id.* at 169.

Kent also offered CUI's version of the loss. Kent explained that CUI's internal policy was that if CUI neither installed nor returned equipment within 30 days of taking it from Comcast, CUI labeled the equipment "stolen." *Id.* at 175. "Once the [equipment] was moved to Stolen [status], Comcast had the right to back charge CUI for the stolen [equipment]." *Id.* Kent then stated that "CUI first received notice of back charges for stolen equipment in April 2015[.]" *Id.* Kent stated that CUI "initially believed that the [equipment] had been either properly installed or properly returned to Comcast," *id.*, but later accepted Comcast's April 2017 conclusion "that the [equipment] had not been returned or installed." *Id.* So CUI "was left with no explanation other than that the [equipment] was stolen." *Id.*

Liberty Mutual denied the claim for three reasons. First, and most important here, Liberty Mutual used CUI's stated discovery date of "April 2015" to determine that CUI had not notified Liberty Mutual "as soon as possible" after the "discovery"

of the loss, as required by the policy. Doc. 35-1 at 100-01. Liberty Mutual also stated that denial was warranted because (a) CUI failed to provide Liberty with relevant documents from their initial claim to Aspen and (b) CUI failed to submit its Proof of Loss form within 120 days, as required by the policy. *Id.*

CUI contested Liberty Mutual's determination that CUI "discovered" the theft in April 2015. Doc. 35-1 at 142. CUI asserted that it had not discovered the theft until April 2017, when CUI eliminated all possibilities but theft. *Id.* at 143. Liberty Mutual rejected CUI's assertion that discovery didn't occur until CUI had eliminated all possibilities but theft by citing the policy's language that CUI had to notify Liberty Mutual as soon as CUI either (a) first learned of facts that would lead CUI to believe a theft had occurred or (b) received notice of an actual or potential claim that CUI owed Comcast for stolen property. Doc. 35-1 at 146.

## E. The lawsuit

CUI sued Liberty Mutual, alleging that Liberty Mutual breached its contract (Count 1) and acted in bad faith (Count 2) when it denied CUI's claim. *See* Doc. 1. The court has diversity jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the claim amount exceeds $75,000.

Liberty Mutual seeks summary judgment on both counts. *See* Doc. 34.

**STANDARD OF REVIEW**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135 (2000).

**ANALYSIS**

Liberty Mutual argues that it did not breach its contract or act in bad faith because it correctly denied CUI's claim for two reasons: (1) CUI failed to provide timely notice; and (2) CUI failed to provide documents from CUI's claim under the Aspen policy. The court explains below why the undisputed facts establish that CUI failed to timely notify Liberty Mutual. Because the failure to provide timely notice defeats both counts in CUI's complaint, the court does not address Liberty Mutual's argument that CUI failed to provide documents about the Aspen policy claim.

**I.    CUI "discovered" the loss in 2015.**

The parties don't dispute the relevant facts; they dispute how to apply the facts to the Policy. Section E(1)(g) of the Policy required CUI to notify Liberty Mutual

"as soon as possible" after CUI "discovered" the loss. The parties disagree when the "discovery" occurred. In short, they argue:

- Liberty Mutual: CUI "discovered" the loss in April 2015 when Comcast told CUI that Melcher was engaged in suspicious activity and that Comcast was back charging CUI for missing equipment.

- CUI: The policy covers theft—not misplacement—of equipment, and CUI did not "discover" that Melcher had stolen the equipment until all other possibilities were eliminated in April 2017.

Because the disagreement concerns a term within the Policy, the court must first determine whether that term is plainly defined. *See AutoOwners Ins. Co. v. Amer. Cent. Ins. Co.*, 739 So. 2d 1078, 1081 (Ala. 1999) ("Whether a clause in an insurance policy is ambiguous is a question of law to be decided by [the court]."). Section F(4) of the Policy defines the word "discover":

> "Discover" or "discovered" means the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this policy has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

> "Discover" or "discovered" also means the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party under circumstances which, if true, would constitute a loss under this policy.

Doc. 35-1 at 121. The court finds that this definition is plain and unambiguous, so the question of when CUI "discovered" the equipment loss is a question of law for

the court. *See Nationwide Ins. Co. v. Rhodes*, 870 So 2d. 695, 696-97 (Ala. 2003)

("If the terms within a contract are plain and unambiguous, the construction of the

contract and its legal effect become questions of law for the court.").

The court also finds that the purpose of the two-part definition is plain and

unambiguous. As the Alabama Supreme Court put it:

> The purposes behind these two types of notice ["timely notice of an
> occurrence" and "timely notice of any legal action"] is well settled: An
> insurer must have timely notice of an event or occurrence in order to
> form an intelligent estimate of its rights and liabilities under the policy,
> to afford it an opportunity to investigate, to allow it to participate in the
> litigation, and to prevent fraud. The purpose of a notice-of-lawsuit
> provision in an insurance policy is to give the insurer the opportunity
> to control litigation on which its contractual liability hinges.

*Travelers Indem. Co. of Connecticut v. Miller*, 86 So. 3d 338, 347 (Ala. 2011)

(citations omitted).

According to the plain language of the Policy, "discovery" occurred the first

time either alternative definition is met. At that moment, CUI had to inform Liberty

Mutual "as soon as possible" so that Liberty Mutual could investigate the matter,

limit its exposure, and prevent fraud. *Id.* The court finds that "discovery" occurred

as early as April 2015, and no later than September 25, 2015, under both definitions.

Under the first definition, CUI was aware in April 2015 of two facts that, when

combined, would cause a reasonable person to assume that CUI had incurred a loss

due to employee theft: (1) Comcast alerted CUI that Melcher was entering missing

10

equipment as being installed in customers' homes that had not been installed; and (2) Comcast told CUI that it was back charging CUI for the missing equipment. That a reasonable person could assume theft was involved is supported by multiple facts. First, CUI was put on notice of Melcher's suspicious behavior by Comcast's "securities" division, a segment of Comcast's operations that Spears (CUI's executive VP) agreed dealt with "fraud or theft or something like that." Doc. 38-1 at 10. Second, Melcher could not give CUI a legitimate reason why he was entering missing equipment as being installed, and Spears testified that he still cannot think of a legitimate reason. Doc. 38-1 at 15. Third, Spears testified that theft crossed his mind:

> Q:    Did you—did it cross your mind that there might be some theft going on from the warehouse?
>
> A:    I wouldn't say it crossed my mind, but it's always there that that's—the ability is there in both dispatch and warehouse perspective. So yes, I would say.

*Id.* CUI knew that warehouse theft was a possibility, and Comcast's security division put CUI on notice that the warehouse manager was wrongly accounting for missing equipment. This makes it reasonable to assume that a theft-related loss had occurred or was about to incur. It is hard for CUI to argue otherwise when CUI told Liberty Mutual in its Proof of Loss that CUI discovered the loss by theft in "April 2015." Doc. 35-1 at 169.

Even if it were not reasonable for CUI to assume that theft had occurred in April 2015, it became reasonable to make that assumption after CUI fired Melcher on September 25, 2015. After conducting its own investigation, CUI fired Melcher because he could not explain why he was wrongly entering missing equipment as being installed in customers' homes. That firing makes little sense if CUI believed that Comcast system error was the only explanation for the missing equipment. Put another way, if CUI was confident enough to terminate Melcher for playing a role in the missing equipment, then CUI can hardly argue now that it was unreasonable to assume that Melcher played a role in the missing equipment.

The court reaches the same result under the second definition of "discovered." Comcast notified CUI in April 2015 that it was issuing a chargeback—or, as the policy puts it, Comcast gave CUI notice of an actual or potential claim for which CUI was liable to Comcast.[1] And Comcast had already told CUI that it suspected Melcher and another employee of suspicious activity over the missing equipment. So when Comcast gave CUI notice of the chargeback in April 2015, that notice was

---

[1] The Court rejects CUI's argument that a chargeback was not a claim under the second definition because "no money ever exchanged hands." Doc. 51 at 18. Comcast's demand that CUI either produce the missing equipment or have its revenue reduced was "a demand for something due or believed to be due,"—*i.e.,* the definition of "claim" that CUI quotes in its brief. *See id.*

received under circumstances that, if Comcast was right about Melcher and his co-worker, would constitute employee theft—*i.e.,* a covered loss.

* * *

In sum, the court finds that CUI "discovered" the loss as early as April 2015, the discovery date that CUI listed in its Proof of Loss, and no later than September 25, 2015, when CUI fired Melcher for his inability to explain his shady entries. At that point, CUI had a duty to inform Liberty Mutual "as soon as possible" to ensure that Liberty Mutual could investigate the matter, limit its potential exposure, and prevent further fraud. *See Miller*, 86 So. 3d at 347.

## II.   CUI did not provide timely notice after discovering the loss in 2015.

The Alabama Supreme Court has interpreted notice requirement phrases like "as soon as possible" to mean that "notice must be given within a reasonable time in view of the facts and circumstances of the case." *Id.* at 346. Once the court determines the discovery date, the court must consider two factors to determine whether the delayed notice was reasonable under Alabama law: (1) "the length of the delay" and (2) "the reasons for the delay." *Id.*

CUI does not dispute that a two-plus year delay meets the first factor. *See, e.g.*, *Pharr v. Continental Cas. Co.*, 429 So. 2d 1018 (Ala. 1983) (finding that an eight-month delay required the insured to explain the reasons for the delay);      *S.*

*Guaranty Ins. Co. v. Thomas*, 334 So. 2d 879 (Ala. 1976) (finding that a six-month delay required the insured to explain the reasons for the delay).

CUI instead argues that it has a reasonable excuse for the delay. CUI believed that a "Comcast systems error," not CUI employee theft, caused the equipment to go missing. Therefore, CUI did not realize that it was wrong until Comcast ended its investigation in April 2017. Doc. 51 at 17-23. CUI argues that it would have been unreasonable to submit a claim to Liberty Mutual before April 2017 because CUI did not believe that the missing equipment was a covered loss until April 2017. *Id.*

CUI argues that whether its mistaken belief was a valid reason to withhold notice is a question of fact for the jury to decide. *Id.* at 20 (citing *Auto-Owners Ins. Co. v. Small*, 2017 WL 958145 at *2 (N.D. Ala. Mar. 13, 2017)). And CUI is correct that, generally, "[i]f there are disputed facts or conflicting inferences that may reasonably be drawn from the evidence, 'the question of the reasonableness of a delay in giving notice is a question of fact for the jury.'" *Miller*, 86 So. 2d at 346 (quoting *Thomas*, 334 So. 2d at 882).

"But if there is no reasonable excuse offered for a delay in giving notice, the issue may be decided as a matter of law." *Id.* So the question is whether Alabama law considers it a "reasonable excuse" that CUI delayed notifying Liberty Mutual for more than two years because CUI did not believe that CUI employees stole the

equipment until Comcast eliminated all other possibilities. It does not. The court

reaches this conclusion based on precedent and the purpose underlying the timely-

notice requirements. The court's reasoning starts with precedent.

In *Thomas*, the insured (Thomas) hung a cable across his aunt's property to

discourage trespassers. 334 So.2d at 881. It worked. The next day, sheriff's deputies

told Thomas that the cable had knocked a man off his motorcycle, seriously injuring

him. Two weeks later, the injured man's attorney mailed Thomas a letter advising

Thomas that he was about to be sued. Despite being advised by his attorney to send

the letter to his insurer (Southern Guaranty), Thomas waited six months because he

did not think he was liable for the accident and did not think the policy covered it.

Southern Guaranty denied coverage for late notice; Thomas sued; and a jury found

that Thomas had given "reasonably timely notice." *Id.* at 882. The trial court denied

Southern Guaranty's motion for judgment notwithstanding the verdict. *Id.*

The Alabama Supreme Court reversed. Relevant here, the supreme court

rejected Thomas' argument that "the delay was reasonable because of [Thomas's]

'belief' that he was not liable for the accident." *Id.* at 884. The court noted that its

precedent accepted late notice only "if the insured ***has no reasonable grounds for***

***believing that any act or omission by it, or any act of its employees, was the cause***

***of an injury*** upon which an action was later based by an injured party against the

insured." *Id.* (quoting *Pan Am. Fire & Casualty v. Dekalb-Cherokee Gas District*, 266 So. 2d 763, 773 (Ala. 1972)) (emphasis added). The court held that Thomas had "reasonable grounds" to believe that he caused the accident because (a) he knew that he put up the cable and (b) he was told the next day that someone was injured. *Id.* The court thus held that Thomas' "purported belief provides no basis for submitting the reasonableness of the delay to the jury." *Id.*

The court cited *Jeannette Glass Co. v. Indemnity Ins. Co.*, 88 A.2d 407 (Pa. 1952) as supporting its conclusion. *Id.* In that case, a steel beam fell on a worker. Jeannette Glass conducted its own investigation and determined it was not liable. So Jeannette Glass did not contact its insurer, Indemnity Insurance. Eight months later, the worker sued Jeannette Glass, and Jeannette Glass notified Indemnity. Indemnity denied the claim due to untimely notice.

The Pennsylvania Supreme Court agreed with Indemnity that notice eight months after the accident was untimely: "the fact that plaintiff investigated the accident and determined it was not liable does not justify the failure." *Jeannette Glass Co.*, 88 A.2d at 412. The Pennsylvania court emphasized that

> the notice clause is designed to enable the insurer to investigate the circumstances of the accident while the matter is yet fresh in the minds of all, and to make timely defense against any claim filed. It might well be that had defendant been notified promptly its investigation by men trained in that work would have revealed a defense to that action. It is equally possible that defendant could have obtained a more favorable

settlement had it learned of the accident immediately. It is for these reasons that the failure to give notice releases the insurer from the obligation of the contract.

*Id.* at 412-13. The court held that Jeannette Glass's excuse that it did not believe it was liable did not create a jury question: "the failure to give notice because plaintiff thought it was not liable is not a sufficient legal excuse." *Id.* at 414.

*Thomas* and *Jeannette Glass* make two important points here. First, CUI's belief that it was not liable for the missing equipment is not a valid legal excuse that can be presented to a jury unless CUI "has no reasonable grounds for believing that any act or omission by it, or any act of its employees, was the cause of an injury[.]" *Thomas*, 334 So. 2d at 844. Second, the purpose of this rule is to allow the insurer the immediate opportunity to investigate the matter and potentially lessen or avoid liability. In fact, protecting insurers' rights is the reason that, unlike most States, Alabama does not require insurers to prove prejudice for untimely notice. *See Midwest Employers Caus. Co. v. East Alabama Health Care*, 695 So. 2d 1169, 1172 ("the purpose of the 'no prejudice rule' is to encourage prompt notice, which allows a primary insurer to exercise early control over the claim").

Applying *Thomas* to this case makes it clear that CUI has not presented a valid legal excuse that can be presented to a jury. Even if CUI had a good-faith belief in 2015 that a Comcast systems error was responsible for the missing equipment, CUI

also had "reasonable grounds for believing that any act or omission by it, or any act of its employees, was the cause" of the missing equipment. *Thomas*, 334 So. 2d at 844. By April 2015, CUI knew that Comcast believed that CUI was to blame for the missing equipment; that Comcast was pointing the finger at Melcher and a co-worker; and, that Comcast had documentary evidence to support its belief. By September 2015, CUI knew that Melcher had no valid explanation for his entries, so CUI fired him.

So even if CUI possessed a good-faith belief that a Comcast systems error was to blame for the missing equipment, CUI had "reasonable grounds" to believe that Melcher could have been to blame instead. *Id.* At that moment (2015), the timely-notice provision required CUI to inform Liberty Mutual about Comcast's chargeback and Comcast's suspicion that CUI employees were involved so that Liberty Mutual could begin its own investigation and potentially limit or disprove its liability. *See Miller*, 86 So. 3d at 347. CUI's decision to wait more than two years to inform Liberty Mutual of the chargeback stripped Liberty Mutual of the chance to investigate the loss while the evidence was fresh.

In sum, CUI's initial belief that Comcast was to blame for the missing equipment is not a valid legal excuse for CUI to wait two years to notify Liberty

Mutual. So CUI is not entitled to a jury determination whether its delay was reasonable, and Count 1 is due to be summarily dismissed.

**III.   If CUI instead "discovered" the loss in 2017, then the Liberty Mutual policy does not cover the loss.**

Again, CUI's primary argument is that it did not "discover" the employee theft until April 2017 and thus the court's analysis in Part II, which assumes discovery in 2015, is irrelevant. If CUI is correct that it did not "discover" a covered loss until April 2017, then Count 1 is due to be summarily dismissed for a different reason.

The Liberty Mutual policy terminated on November 18, 2016, five months before CUI claims that it discovered Melcher's theft. Because the discovery occurred after the Liberty Mutual policy terminated, to be covered, CUI would have to satisfy the following "Extended Period To Discover Loss," or "tail," provision:

> We will pay you for loss that you sustained prior to the effective date of cancellation of this policy, which is 'discovered' by you:
>
> (1) No later than 1 year from the date of that cancellation. However, this extended period to 'discover' loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

Doc. 35-1 at 112 (Section E(1)(j)(1)). Under the plain language of the tail provision, Liberty Mutual's coverage of late-discovered losses was "immediately" terminated

on the day that another policy became effective, even if the new policy failed to "provide coverage for loss sustained prior to its effective date." *Id.*

The Aspen policy took effect on November 18, 2016. So under the plain language of the Liberty Mutual tail provision, Liberty Mutual did not have to pay for any loss that CUI discovered after November 18, 2016, even if the Aspen policy did not cover the loss either.

In short, if CUI is correct that failed to discover the employee theft until April 2017, then the Liberty Mutual policy does not cover the loss. So Count 1 (breach of contract) would be summarily dismissed.

## IV.    Without a breach of contract, there is no bad faith.

Summarily dismissing Count 1 (breach of contract) necessarily dictates summary dismissal of Count 2 (bad faith). Under Alabama law, CUI must prove these elements to establish bad faith: (a) Liberty Mutual breached a valid contract between the parties; (b) Liberty Mutual intentionally refused to pay CUI's claim; (c) Liberty Mutual had no reasonably legitimate or arguable reason to refuse to pay CUI; and, (d) Liberty Mutual knew that it had no legitimate or arguable reason to pay CUI. *See National Sec. Fire & Cas. Co. v. Bowen*, 417 So.2d 179, 183 (Ala. 1982).

As explained in Parts I-III, Liberty Mutual had a legitimate reason to deny CUI's claim and thus did not breach the contract between the parties. So CUI cannot

meet at least two of the requisite elements to prove bad faith. Count II is therefore due to be summarily dismissed.

## CONCLUSION

For the reasons stated above, Liberty Mutual's motion for summary judgment (doc. 34) is due to be **GRANTED**, and both counts in CUI's complaint are due to be **DISMISSED WITH PREJUDICE**. The court will enter a separate order carrying out this conclusion.

**DONE** on August 24, 2020.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE

21